# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| THOMAS P. MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:04-CV-047 |
| | ) | |
| DEKALB COUNTY CENTRAL UNITED | ) | |
| SCHOOL DISTRICT and KENNETH | ) | |
| FOWBLE, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

## I. INTRODUCTION

Thomas P. Martin was a teacher for the DeKalb County Central United School District ("the District") from 1992 until 2003.  In the final years of his employment, Martin's teaching became ineffective and his behavior increasingly unprofessional, until at the end of the 2002-03 school year the District declined to renew his contract.  Martin, however, claims to suffer from obsessive/compulsive disorder ("OCD") and attention deficit disorder ("ADD"), and he believes that these alleged disabilities (1) were not reasonably accommodated by the District; and (2) motivated the District's non-renewal of his contract.  Accordingly, he brought this suit against the District under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq.*[1]

The District has now moved for summary judgment.  (Docket # 49.)  After considering

---

[1] Accordingly, subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

Martin's complaint also names Kenneth Fowble, the District's superintendent, as a defendant in his official capacity.  (Compl. ¶ 9.)  However, suing Fowble in his official capacity is "just another way of pleading an action" against the District, *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985), so this opinion refers to both defendants as simply "the District."

the motion and the relevant law, the Court finds that the motion should be GRANTED.

## II. FACTS

Martin was originally employed by the District as a teacher in the Learning Disability ("LD") Resource Room at McKenney-Harrison Elementary School. (Aff. of Kenneth Fowble ¶ 3.) For the first several years of his employment, the District was satisfied with Martin's performance, as reflected in several performance reviews. (*See* Br. in Opp'n to Def.'s Mot. for Summ. J. at 2-3 and materials cited therein.)

In August 1997, Martin wrote to Keith Perry, then the District's superintendent, that he would require a medical leave of absence for at least the first sixty to ninety days of the upcoming school year. (Dep. of Keith Perry, Ex. 1.) Martin's letter was accompanied by a letter from Dr. Thomas Kintanar stating that Martin was currently unable to work due to an unspecified disability. (*Id.*) As it turned out, Martin ended up taking a leave of absence for the entire 1997-98 school year, during which he underwent treatment for depression and OCD. (Dep. of Thomas P. Martin 53-54; Perry Dep., Ex. 1.)

The following summer, Martin wrote to Perry that he was ready to return to work, and Dr. Kintanar wrote to Perry on June 20, 1998, that Martin "should be relatively stable to go back to work after extensive counseling." (Perry Dep., Ex. 1.) Perry wrote back directly to Dr. Kintanar on July 6, 1998, and asked him (1) to clarify the phrase "relatively stable"; and (2) whether this "extensive counseling" had already taken place. (*Id.*) A brief exchange of letters between Martin's attorney and the District's attorney then ensued: Martin's attorney first wrote on July 20, 1998, to demand that Martin be assigned a full-time teacher's aide as a reasonable accommodation under the ADA, but the District's attorney responded two days later that the

ADA did not require such an accommodation.  (*Id.*)  However, this dispute was rendered moot on August 10, 1998, when Dr. Kintanar wrote that Martin was now "clinically stable" and "fit to teach in a full time capacity without restrictions."  (*Id.*)  Based on this representation, the District allowed Martin to return to his position in the LD Resource Room at McKenney-Harrison at the start of the 1998-99 school year.  (Martin Dep. at 56.)

The next two years of Martin's employment passed without incident.  However, in the fall of 2000, Martin began to receive reprimands and criticism from Sherry Grate, the new principal at McKenney-Harrison.  On October 13, 2000, Martin made unprofessional and insulting comments about a student during a meeting with the student's parent, and three days later he wrote inappropriate notes on a document in a student's file; both of these acts drew written reprimands from Grate.  (Aff. of Sherry Grate ¶ 2, 3, Ex. A, B.)  On October 30, 2000, Grate observed Martin's class for fifty minutes, and she noted that Martin frequently contradicted himself – for instance, Martin asked a student if he wanted to go out and play, but then told him he could not go out because the last time "he wouldn't come in."  (*Id.* ¶ 4, Ex. C.)  After this observation, Grate prepared notes for Martin with suggestions on how to be more effective in class.  (*Id.*)

Grate and Martin met on November 8, 2000, to discuss several of Grate's concerns about his performance, including his failure to follow the "Functional Behavior Plan" of one of his students.  (*Id.*, Ex. D.)  On the same day, Martin sent a memo to Grate requesting that, in the future, she put any concerns about his work in writing, and informing her that "[b]ecause of my ADD[,] I have great difficulty comprehending and retaining what you say."  (*Id.*, Ex. E.)

Grate observed Martin's class again on December 6, 2000, this time for two hours and

3

fifteen minutes. (*Id.* ¶ 7, Ex. F.) During this time, Grate noted many deficiencies in Martin's teaching, including: contradicting himself, using sarcasm with students, failing to follow a student's behavior plan, pacing and becoming frustrated when his instructional assistant left the room, losing control of the class, and failing to intervene in a student argument. (*Id.*)

Martin's failings as a teacher, and Grate's memorialization of them, became even more frequent during the second half of the 2000-01 year. On January 10, 2001, Grate wrote Martin two memos. The first reprimanded him for inappropriate behavior during a parent conference; Martin clipped his fingernails during the meeting and then made an unsubstantiated, inappropriate comment about a student having "hallucinations," much to the parent's consternation. (Dep. of Sherry Grate, Ex. 1.) The second memo chastised Martin for demeaning a kindergarten student named Brandon in front of his class and another staff member, and then documented Martin's other recent problems dealing with Brandon. (*Id.*) Specifically, Martin had been sending Brandon (who was his only student during the afternoon) to the office almost daily for discipline, and Grate believed that Martin was doing so in order to shirk his responsibilities for the afternoon. (*Id.*) A January 30, 2000, memo from Grate noted that Martin failed to implement an alternative teaching plan on an afternoon when Brandon was absent, and that he had also failed to give Grate a copy of the plan as she had previously requested. (Grate Aff., Ex. I.)

Grate then prepared a performance evaluation for Martin on February 28, 2001. (*See* Grate Dep., Ex. 4.) The evaluation paints a clear picture of Martin as a failure in nearly every relevant aspect of his job. Out of the thirty criteria Grate used to evaluate him, he received a score of "needs improvement" or "unacceptable" on all but five – and three of those five

4

involved tangential qualities such as punctuality, attendance, and appropriate dress.  (*Id.*)  The evaluation contained an extensive recitation of Martin's many inappropriate behaviors, including those described *supra* and still others, such as locking a student out of his classroom and putting another student in a headlock.  (*Id.*)

   At the same time that the above events were transpiring (that is, throughout the 2000-01 school year), Martin and the District were engaged in frequent correspondence about Martin's disabilities and how best to accommodate them.  Martin informed Grate that he had ADD "within the first two weeks of school" (Martin Dep. at 84), and on November 14, 2000, he wrote a letter to Grate requesting that his disability be accommodated by transfer to a "regular classroom assignment" (that is, a non-special-education class) (*id.*, Ex. H.).  Superintendent Perry asked Martin to provide documentation of his medical condition, and Martin eventually complied on February 21, 2001, by providing Perry with two doctor's letters.  (Perry Aff. ¶ 4, 7.)  The first, from Dr. Kintanar, noted that Martin was being treated for anxiety, depression, and OCD, and opined that Martin "should have an assignment without such a high concentration of children with learning disabilities and [have] more working relationships with adults . . . more attuned with [a] traditional classroom setting."  (*Id.*, Ex. C.)  The second, from Dr. Prevesh K. Rustagi, Martin's treating psychiatrist, stated that Martin required an accommodation of some sort, but did not specify what form it might take.  (*Id.*, Ex. D.)

   On March 20, 2001, Martin executed and provided the District with consent forms for the release of his medical records from Drs. Kintanar and Rustagi.  (Perry Dep., Ex. 2, 3.)  However, the discussion about accommodating Martin's disabilities was cut short on April 16, 2001, when Martin informed the District that he was "temporarily totally disabled" for the remainder of the

2000-01 school year.  (Dep. of Keith Fowble, Ex. 2.)  Martin was thus on leave for the rest of the

school year, and the District had no further communications with him or his doctors about his

conditions during that time.  (*See id.* at 12.)

Over the summer, Martin informed the District that he was able to return to work the

coming school year, and the District subsequently decided to grant his requested accommodation

of a "regular classroom assignment."  Accordingly, Martin received a transfer to James R.

Watson Elementary School ("Watson"), where he would teach fourth grade under the

supervision of Principal Scott Clay.  (Perry Dep., Ex. 1.; Martin Dep. at 90.)  Clay and Martin

knew each other already, having taught together earlier in their careers (Dep. of Scott Clay at 4),

and by all indications their new relationship started on a positive note.  Martin indicated to Clay

that "he would be rusty from not having taught fourth grade for a long time" and would

appreciate Clay's assistance.  (*Id.* at 31.)  Clay decided that Martin would benefit from receiving

two formal evaluations during the 2001-02 school year; although this is more than usual (*id.* at

11), Martin agreed to this plan in writing, stating that it "makes good sense" (*id.*, Ex. 7).  While

no one from the District informed Clay of Martin's disabilities or his previous problems at

McKenney-Harrison (*id.* at 6-10), Martin told Clay in writing as early as August 23, 2001, that

he (1) had made previous requests for accommodations of "certain disabilities"; (2) suffered

from anxiety; and (3) would appreciate Clay "putting thoughts of importance to me in writing"

(*id.*, Ex. 7).

As it turned out, Clay ended up having many "thoughts of importance" to share with

Martin in writing, and virtually none of them were good.  During the two school years that

Martin taught fourth grade at Watson, 2001-02 and 2002-03, his behavior became increasingly

disturbing and unprofessional, and the record contains dozens of memos from Clay reprimanding and attempting to correct these shortcomings.  (*See id.*, Ex. 2.)  In the 2001-02 school year alone, Martin:

•       Told a student that the student's grandfather should be in prison for shooting guns at home;

•       Informed his class that "Germans are idiots";

•       Was late to a parent meeting, refused to answer the parent's questions, and laughed out loud at the parent's suggestions;

•       Sent students to the computer lab without supervision (a violation of school board policy), thus allowing four of the students to access the Internet even though they had no parental permission form on file; and

•       Took a student on a field trip without a permission slip, which was also a violation of board policy, as it created a serious risk – had the student been injured, Martin would not have been able to authorize emergency treatment.

(*Id.*; Aff. of Scott Clay ¶¶ 6, 7, 8.)  This list is not at all exhaustive, but it gives a flavor of Martin's behavior.  Due to these and many other failings, Clay's performance evaluations of Martin were generally poor, particularly the second evaluation.  (Clay Dep., Ex. 5.)  There, Clay told Martin that "I have worked with you more than any other teacher in my career to provide assistance . . . . [and] role-model[ing]," but lamented that Martin had still failed to become "self-sufficient" and his performance was "unacceptable."  (*Id.*)  Clay stated that Martin's performance was bad enough that he "could recommend to the Superintendent that your contract . . . be cancelled," but informed Martin that he would get "one more school year" as a "last

chance" to make "substantial improvement."  (*Id.*)  Wrote Clay, "[y]ou are on notice that your

job is in jeopardy."  (*Id.*)

Despite these warnings, Martin's performance during the 2002-03 school year was no

better.  An exhaustive list of his misconduct would be unwieldy and redundant, but among the

highlights, Martin:

•        Left a student behind at school while the rest of the class went on a field trip;

•        Appeared to be "winging it" when Clay observed him in the classroom, as his teaching

         bore little relationship to his lesson plans;

•        Trained his students to always keep the classroom door closed, telling them that there

         were spies in the building;

•        Zipped himself into a tent at the front of the classroom during class, and when a guidance

         counselor happened to come into the room to speak to him, unzipped the tent, saw her,

         and zipped the tent back up;

•        After receiving negative comments from an assistant principal who observed his

         classroom, had his students conduct a letter-writing campaign to her stating what they

         liked about class that day;

•        Calculated grades and sent out report cards four weeks before the end of the grading

         period, and then refused to correct his mistake or respond to a parent's complaint about

         it; and

•        Held a student down and tickled him until he could not breathe.

(Clay Dep., Ex. 2; Clay Aff. ¶¶ 12-18; Aff. of Mindy Renier ¶¶ 3-7.)

During the 2002-03 school year, while Martin was engaged in this behavior, he also had

a brief dialogue with the District about further accommodations for his disabilities.  On September 30, 2002, Martin wrote to Clay to "remind" him of Martin's "learning disability as well as anxiety condition which create special challenges for me," and stated that he needed "supportive efforts made by my fellow team members."  (Clay Aff., Ex. G.)  The letter did not contain a request for any specific accommodation, nor was it supported by any medical documentation.  (*See id.*)  Nonetheless, Keith Fowble (who had replaced Perry as superintendent) treated the letter as a request for a reasonable accommodation under the ADA, and responded in writing on October 30, 2002.  (*See* Aff. of Keith Fowble, Ex. C.)  Fowble promised to "continue the interactive dialogue" to determine if any reasonable accommodations could be provided, and in order to expedite that dialogue, he requested the following from Martin, *inter alia*: (1) current medical documentation of his disabilities; (2) a medical opinion identifying which job functions his disabilities prevented him from performing; and (3) a doctor's suggestions as to what reasonable accommodations could be provided to help Martin meet his job expectations.  (*Id.*)

Martin never responded to Fowble's letter.  (*Id.* ¶ 8.)  However, several months later, on April 2, 2003, Martin complained in a letter that the District had "refused to accommodate [his] anxiety and depression."  (Grate Aff. ¶ 12, Ex. J.)  Two days later, Sherry Grate (who had since become Assistant Superintendent) responded in writing, reminding Martin that he never answered Fowble's October 30, 2002, letter requesting more information about his disabilities and possible accommodations.  (*Id.*)  Grate further stated that if Martin currently required accommodation, he should comply with the requests for information in Fowble's letter, a copy of which was enclosed.  (*Id.*)  Martin never responded to Grate's letter either, and there were no

further communications between the parties about accommodations.  (Grate Aff. ¶ 12.)

Meanwhile, by the second semester of the 2002-03 school year, Principal Clay had seen enough.  He completed a performance review for Martin on March 20, 2003, and out of the thirty-one criteria on which Martin was judged, he received a "Needs Improvement" on six and an "Unacceptable" on ten.  (Clay Dep., Ex. 6.)  Further, the narrative sections of the evaluation contained a comprehensive recitation of Martin's failings, including the following comments:

- "unable to implement his lessons effectively"

- "students are often ill prepared"

- "an atmosphere of suspicion and secrecy [in the classroom]"

- "lacks effective, meaningful communication with parents"

- "made it very clear to us that he has no intentions of talking to [any] parent who is critical of his work"

- "unprofessional and disrespectful toward his coworkers"

- "[c]olleagues have asked to not have to work directly with him"

- "has great difficulty following . . . policies and procedures"

- "record keeping of students is scant at best"

(Clay Dep., Ex. 6.)  In the final section of the evaluation, titled "Improvement Plan," Clay wrote only one sentence: "I will be recommending that the school board consider the cancellation of your permanent teacher contract."  (*Id.*)

The school board then conducted a three-day hearing to determine Martin's fate, during which it heard testimony from twenty-four witnesses and reviewed 157 exhibits.  (Fowble Aff. ¶ 9.)  On May 22, 2003, the Board issued a fifty-one page memorandum, laying out Martin's

failings in painstaking detail and announcing the Board's unanimous decision to cancel his

contract.  (*Id.*, Ex. D.)

## III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of

material fact.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  When ruling on a motion for

summary judgment, a court "may not make credibility determinations, weigh the evidence, or

decide which inferences to draw from the facts; these are jobs for a factfinder."  *Id.*  The only

task in ruling on a motion for summary judgment is "to decide, based on the evidence of record,

whether there is any material dispute of fact that requires a trial."  *Waldridge v. Am. Hoechst*

*Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  If the evidence is such that a reasonable factfinder could

return a verdict in favor of the nonmoving party, summary judgment may not be granted.  *Payne*,

337 F.3d at 770.  A court must construe the record in the light most favorable to the nonmoving

party and avoid "the temptation to decide which party's version of the facts is more likely

true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants."

*Id.*  However, "a party opposing summary judgment may not rest on the pleadings, but must

affirmatively demonstrate that there is a genuine issue of material fact for trial."  *Id.* at 771.

## IV. DISCUSSION

Martin alleges two distinct violations of the ADA; first, that the District failed to

reasonably accommodate his disabilities, and second, that the District's termination of his

contract was discriminatory.  It should be noted at the outset that Martin's litigation strategy is

somewhat unusual.  Like most employment-discrimination defendants, the District has proffered

a slew of evidence that Martin was not competent at his job – the evidence recounted *supra*

11

unquestionably demonstrates that Martin utterly failed at his job and perhaps even became a danger to his students.  But unlike most employment-discrimination plaintiffs, Martin contests none of this evidence.  In essence, he admits that he failed at his job.  He instead hinges his case on the idea that his many shortcomings were *caused* by the District; that is, the District's handling of his disabilities actually exacerbated those disabilities and thus assured his failure.[2]

As shown throughout the following discussion, Martin's theory of the case is not supported by the record.  Accordingly, neither of his claims withstand summary judgment.[3]

### A. Martin Is Not a Qualified Individual With a Disability

The ADA does not protect Martin at all unless he can prove he is a "qualified individual with a disability," *Ross v. Ind. State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998), defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires."  42 U.S.C. § 12111(8).  The Seventh Circuit has parsed this definition into a two-part test, requiring the plaintiff to establish that (1) he has the requisite skill, experience, education, and other job-related requirements for his position; and (2) he can perform the essential functions of the job, either with or without a reasonable accommodation.

---

[2]Martin asserts in a conclusory footnote that he "does not concede that his performance was in fact deficient even at the time of his dismissal, and contends that this is a matter for the trier of fact to determine."  (Br. in Opp'n at 15 n.1.)  However, he proffers absolutely no evidence to counter the District's overwhelming evidence of his failings, and instead spends the entirety of his brief (outside of that footnote) claiming that his problems were caused by the District.  Thus, it is fair to say that he has conceded the District's description of his inadequate performance. *See, e.g., Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001) ("conclusory statements, unsupported by the evidence of record, are insufficient to avoid summary judgment").

[3]In addition to admitting his failures at the job, Martin also concedes that his claims must be limited to events occurring after November 6, 2002, due to the statute of limitations.  (Br. in Opp'n at 1.)  While the Court's discussion *infra* does not rest on the statute of limitations, it should be noted that Martin's concession makes his already-thin case even thinner.

*Ross*, 159 F.3d at 1013.  The plaintiff has the burden of proof on both prongs.  *Id.*  Here, Martin fails on the second prong.

Courts afford deference to an employer's judgment of what the essential functions of a job are.  *DePaoli v. Abbott Lab.*, 140 F.3d 668, 674 (7th Cir. 1998).  Here, the District proffers a list of "Essential Duties" included in Martin's written job description (Fowble Aff., Ex. E), and it is undisputed that Martin failed at many of them.  For example, one function is "Counsels, confers, and communicates with parents, regarding pupil progress, and to interpret the educational program"; Martin does not dispute the ample evidence that he frequently refused to speak with parents, made rude and unsubstantiated comments to them about their children, and belittled their suggestions.  Another function is "Assists and cooperates with school and district personnel," and Martin does not dispute that he was frequently rude and unprofessional to both coworkers and supervisors.  And of course, the most important function on the list is "Teaches and instructs pupils in [various subjects] in a classroom setting," and Martin has proffered nothing to counter the District's extensive documentation of his ineffectiveness in the classroom.

Martin, nonetheless, claims that he is still a "qualified individual with a disability" because he *could* have performed these functions had he been granted the proper accommodations.  His only evidence on this point is the affidavit of Dr. Rustagi, who recommends four accommodations for Martin, which can be summarized as follows: (1) new tasks should be assigned to Martin in specific, step-by-step, written terms, and with sufficient notice; (2) he requires a mentor; (3) any supervision should be "structured," and if extra supervision is necessary, he should receive a written explanation; and (4) he must be treated "in

a supportive and empathic manner rather than in a critical disciplinarian manner."[4]  (Aff. of Dr.

Prevesh Rustagi ¶ 8.)

The District has moved to strike Dr. Rustagi's affidavit, but there is no need to determine

its admissibility; even if it is admitted, it is insufficient to create a genuine issue of material fact.[5]

The most glaring problem is that Dr. Rustagi does not demonstrate, or even claim, any

knowledge of the essential functions of Martin's position.  Martin implores the Court to "infer"

such knowledge from the affidavit (Pl.'s Omnibus Reply at 2), but Dr. Rustagi's reasoning is so

sparse that even such an inference is impossible.  For example, it is not obvious, nor does Dr.

Rustagi explain, how the recommended accommodations will allow Martin to effectively

communicate with parents (an essential job function that he has repeatedly failed to execute) –

indeed, Dr. Rustagi's affidavit does not even indicate that he is aware of Martin's previous

failures at parent communication.  The same goes for the rest of Martin's myriad deficiencies as

a teacher; Dr. Rustagi simply provides no reason to believe that the proposed accommodations

will ameliorate them.[6]  "The Federal Rules of Evidence permit experts to present naked opinions,

but admissibility does not imply utility. . . . An expert who supplies nothing but a bottom line

---

[4]As discussed in Part IV(B) *infra*, Martin never requested these four accommodations during his employment – it was only during the course of this lawsuit that he first communicated them to the District.

[5]The District's motion to strike (Docket # 59) is thus moot, insofar as it argues for striking Dr. Rustagi's affidavit.  The motion also seeks to thwart Martin's attempt to introduce a 2002 arbitrator's decision into the record.  The arbitrator's decision largely concerned an unrelated contractual dispute between Martin and the District, but Martin wants to introduce it here because the arbitrator commented in *dicta* that he thought the District was overly critical of Martin.  These extraneous musings of the arbitrator carry little evidentiary weight and thus have no bearing on the Court's decision in this case.

In short, since the District is entitled to summary judgment even if Dr. Rustagi's affidavit and the arbitrator's decision are admitted, there is no need to rule on their admissibility.  The motion to strike is therefore moot and will be DENIED.

[6]One wonders: how would having a mentor or receiving more "supportive" treatment have prevented Martin from, say, holding a student down and tickling him until he could not breathe?  Or telling his class that "Germans are idiots"?

14

supplies nothing of value to the judicial process, and his naked opinion does not preclude summary judgment." *Am. Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1464 (7th Cir. 1996) (Posner, C.J., dissenting) (internal quote marks omitted) (quoting *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)).

There is second, equally fatal problem with Dr. Rustagi's affidavit.  It does *not* say that, if given the four accommodations, Martin will be able to perform the essential functions of his job; rather, it says that with these accommodations "Martin could function in his job as a teacher in the [District], *except for episodes of acute depression and mania*."  (Rustagi Aff. ¶ 8 (emphasis added).)  Dr. Rustagi does not elaborate further, but a common medical resource states that manic attacks often "may last for a few days or several months."  *The American Medical Association Encyclopedia of Medicine* 663 (1989).  Implicit in the definition of a "qualified individual" is that the individual will be able to perform the essential functions of his job at all times, and since even Martin's doctor admits that he will be unable to perform them during "episodes" which may stretch for days or months, it follows that Martin is not a "qualified individual" under the ADA.  *See, e.g., Amadio v. Ford Motor Co.*, 238 F.3d 919, 927-28 (2001) (holding that employee who is frequently unable to attend job is not "qualified individual with a disability") (collecting cases).

For both of these reasons, Dr. Rustagi's affidavit cannot possibly meet Martin's burden of showing that he can perform the essential functions of his job with accommodations.  The Seventh Circuit has reiterated many times that a plaintiff cannot avert summary judgment with conclusory, "self-serving affidavits without factual support in the record" nor with "sheer speculation."  *E.g., Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir.

15

1998).  The same goes for a plaintiff's doctor.  Thus, the Court finds as a matter of law that Martin is not a "qualified individual with a disability," which is fatal to both of his claims.[7]

Yet, even if one assumes *arguendo* that Martin is a "qualified individual with a disability," his claims each fail on their own merits.  They are considered in turn *infra*.

### B. The District Did Not Fail to Reasonably Accommodate Martin's Disabilities

The ADA prohibits discrimination against the disabled, and one form of such discrimination is the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  Accordingly, once an employer knows of an employee's disability and the employee has requested reasonable accommodations, the employer must engage in an "interactive process" with the employee to determine what precise accommodations are necessary.  *Ross*, 159 F.3d at 1013-14; *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996).  Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown in the process.  *Ross*, 159 F.3d at 1013-14; *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

Because the parties' exchanges about accommodating Martin's disabilities were rather sporadic, a brief recap is necessary here.  The first time Martin ever requested an

---

[7]In a last-ditch attempt to avoid this result, Martin notes that his performance was satisfactory for several years before his problems began, and claims that "[t]his fact alone might cause a reasonable trier of fact to conclude" that he is a "qualified individual with a disability."  (Pl.'s Omnibus Reply at 1.)  The settled law of this circuit says otherwise.  In other employment-discrimination contexts, the Seventh Circuit has repeatedly held that an employee's satisfactory performance in the past is irrelevant to whether the employee was meeting employer expectations at the time of termination.  *E.g., Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004).  The same concept applies here: just because Martin was arguably able to perform the essential functions of his job eight or ten years ago does not give rise to an inference that he could do so, or was in fact doing so, at the time of his termination.  Thus, his prior performance is insufficient to avert summary judgment on the issue of whether he is a "qualified individual with a disability."

accommodation was on July 20, 1998, when his attorney wrote a letter demanding that he be assigned a full-time teacher's aide.  The District, through its attorney, responded that this accommodation was not required by the ADA.  But before this debate went any further, a doctor cleared Martin to work without restrictions or accommodations, and the subject became moot.

Two years later, on November 8, 2000, Martin asked Grate to begin putting any concerns about his work in writing.  It is undisputed that she did so from then on.

At about the same time, on November 14, 2000, Martin requested that he be transferred from his special education position to a regular classroom.  After some delay – mostly due to Martin's four-month lag in getting medical documentation to the District and his subsequent leave of absence – the District granted his request, reassigning him to a fourth-grade classroom.

On August 23, 2001, Martin asked Clay, like he had previously asked Grate, to put any important comments to him in writing.  Like Grate, Clay abided by Martin's wishes.

On September 30, 2002, Martin made an extremely vague request for more "supportive efforts made by my fellow team members."  The District treated this as a request for an accommodation and asked Martin for basic supporting information, such as a doctor's letter identifying Martin's claimed disabilities, the job functions he was unable to perform, and suggested accommodations.  Martin made no response.

Five months later, Martin complained that the District had "refused" to accommodate him, and so the District reiterated its request for supporting documentation.  Martin again failed to respond.  Shortly thereafter, his contract was cancelled and he brought this lawsuit.

The outcome is clear: no reasonable jury could possibly conclude that the District was at fault for any breakdown in the "interactive process" required by the ADA.  Martin made six

17

requests for accommodation; the first became moot when he was cleared to work without restrictions, and the next three were all granted by the District.  Martin thus bases his claim on only the last two, and those went nowhere because Martin refused to provide even the most basic information that would allow the District to consider his requests.  Since the only breakdowns in the process were caused by Martin alone, the District cannot be liable for a failure to reasonably accommodate him.  *Ross*, 159 F.3d at 1013-14; *Hoffman*, 256 F.3d at 572.

The Seventh Circuit's reasoning in *Beck* is particularly apt here:

> [C]ourts should attempt to isolate the cause of the breakdown [in the interactive process] and then assign responsibility.  For example, the cause of the breakdown might be missing information. . . . Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process. . . . [Here,] Beck received a memorandum from the assistant dean stating that he needed more information to know how to accommodate her disability; she never provided the additional information. . . . At no point did Beck tell the University exactly what she needed. . . . Because the University was never able to obtain an adequate understanding of what action it should take, it cannot be held liable for failure to make 'reasonable accommodations.'

*Beck*, 75 F.3d at 1135-37.  Just so in this case.  The interactive process broke down simply because Martin twice refused to provide any information that would help the District accommodate his disabilities, and thus no liability attaches.  *Id.*; *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998) (affirming summary judgment where employee "failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions"); *see E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 950-52 (7th Cir. 2001) (en banc) (affirming summary judgment where employee, *inter alia*, refused to fill out an "ADA accommodation review form").

Martin, however, proffers a novel theory to the contrary.  In his view, the District is

responsible for the breakdown because, even though he failed to respond to its requests for information, the District was obligated to contact his doctors *directly* in order to learn more about his disabilities and how they might be accommodated.  Martin seizes on one fact to support this theory: way back in the summer of 1998, when Martin sought to return from a leave of absence and Dr. Kintanar opined that he "should be relatively stable to go back to work after extensive counseling," the District wrote directly to Dr. Kintanar requesting clarification of this statement.  According to Martin, at that moment the District "established a procedure [of] . . . directly contacting Martin's physicians concerning Martin's disabilities."  (Br. in Opp'n at 4-5.)  Thus, the argument goes, when Martin requested an accommodation four years later in 2002, the District could not fulfill its obligations under the ADA unless it followed this "procedure" and attempted to directly contact his doctors about potential accommodation.

This theory, while creative, is not supported by the record.  First, it is important to note that the District's letter to Dr. Kintanar (which was the only time the District ever directly contacted one of Martin's doctors) was not for the purpose of discussing a reasonable accommodation; rather, it was a request to clarify Dr. Kintanar's exceedingly vague statement concerning whether Martin was fit to return to teaching after a disability leave.  Indeed, this letter could not possibly have concerned a reasonable accommodation, as it was written two weeks *before* the first time Martin ever requested one.  Thus, Martin's assertion that this letter "established a procedure" of direct communication with his doctors about accommodations is without support in the record.

Moreover, even if the District had "established" this "procedure" in 1998, the parties subsequently abandoned the practice.  Martin's next three requests for accommodations, in 2000

19

and 2001, were all granted, and at no time during these interactive processes did the District directly contact his doctors. To the contrary, when Martin requested a transfer to a regular classroom assignment in 2000, the District asked *Martin* to get the supporting documentation from his doctors, and he eventually complied. Therefore, it was hardly reasonable for Martin, in 2002, to ignore the District's requests for medical information and expect it to inquire directly of his doctors.

Finally and most importantly, regardless of what the parties' "procedure" was in the past, direct contact with Martin's doctors would have been futile here because the District lacked his consent. Martin makes much of the consent forms he executed on March 20, 2001, allowing the District to seek his medical records from Drs. Kintanar and Rustagi; by his account, the District's failure to directly contact his doctors is all the more suspicious because the District had these consents in hand. But Martin fails to note that the consents, by their own terms, expired sixty days after their execution. (Perry Dep., Ex. 2, 3.) This means that they were expired for over a year by September 2002, which in Martin's view is when the District should have first contacted his doctors directly to discuss his conditions and potential accommodations. Yet, without Martin's consent, his doctors could not have disclosed any of the information the District sought without violating Indiana law. *See* Ind. Code § 16-39-2-3 (providing that, with immaterial exceptions, "[a] patient's mental health record is confidential and shall be disclosed only with the consent of the patient"); § 16-18-2-226 (defining "mental health records" as any "recorded or unrecorded information concerning the diagnosis, treatment, or prognosis of a patient receiving mental health services").

In sum, when Martin made his final two requests for accommodation: (1) the District had

20

never directly contacted Martin's doctors about accommodating his disabilities; (2) the District had successfully accommodated him three times in the past without directly contacting his doctors; and (3) directly contacting his doctors would have been futile, unless his doctors disregarded Indiana law.  Accordingly, no reasonable jury could find that the breakdown in the interactive process was due to the District's failure to directly contact Martin's doctors.

Martin proffers one other argument, but it is equally unpersuasive.  He claims that the District never informed Grate and Clay of Martin's disabilities, and that this somehow hindered their (and the District's) ability to accommodate those disabilities.  In particular, he notes that his transfer to Watson, with Clay as his new supervisor, was intended to accommodate his disability, but that the District never informed Clay of that fact, thus "prevent[ing] . . . Clay from having the information that would have been useful to establishing a better rapport with . . . Martin."  (Br. in Opp'n at 16.)  Thus, in Martin's view, as soon as he started working under any new supervisor, the District was required to inform that supervisor of his disabilities and previous accommodations.

There are two flaws in this theory.  First, there was no reason for the District to inform either Grate or Clay of Martin's disabilities.  Martin began working for Grate almost immediately after Dr. Kintanar had cleared him to work with no restrictions, and he began working for Clay immediately after having been granted the only accommodation he had then asked for (transfer to a regular classroom).  Thus, Martin began his tenure under both Grate and Clay with a clean bill of health, so to speak; there was no reason for the District to suspect that he needed any special treatment from Grate or Clay, and thus no reason to specifically inform them of his disabilities.  Second, even if the District *should* have so informed Grate and Clay, its

21

failure to do so was harmless, because Martin himself informed them early in his tenure with each. He told Grate of his disabilities within the first two weeks of school and later asked her for an accommodation (putting criticisms in writing), which she granted. Similarly, he told Clay of his disabilities in August 2001 and asked for the same accommodation, which Clay granted. Thus, the Court is at a loss to see how the District's failure to officially notify Grate or Clay of Martin's disabilities had any effect on his requests for accommodations.

In summary, any failure of the District to reasonably accommodate Martin's disabilities was caused by a lack of communication from Martin, not the District. The interactive process did not break down because the District failed to contact Martin's doctors directly nor because it failed to inform his supervisors of his disabilities. Rather, the process broke down because Martin, immediately after making each of his two vague requests for an accommodation, clammed up and failed to engage in the process at all. The District can hardly be expected to grant an accommodation to an employee who will not tell it why an accommodation is necessary or what sort of accommodation might do the trick. Thus, the District is entitled to summary judgment on Martin's failure-to-accommodate claim. *E.g., Beck*, 75 F.3d at 1135-37.

### C. Martin Cannot Make A Prima Facie *Case That His Termination Was Discriminatory*

Martin's second claim is that the school board's termination of his contract constituted disability discrimination. Unlike his failure-to-accommodate claim, Martin's termination claim is subject to the standard analysis used in most employment discrimination cases, wherein the plaintiff can contest summary judgment by using either the direct or indirect method of proof. *King v. Preferred Technical Group*, 166 F.3d 887, 891-92 (7th Cir. 1999). The direct method requires the plaintiff to produce enough evidence, whether direct or circumstantial, *Troupe v.*

*May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994), to create a triable issue of whether the adverse employment action had a discriminatory motivation, *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997).

The indirect method is the well-known *McDonnell Douglas* burden-shifting framework. *E.g., King*, 166 F.3d at 891-92.  Here, the plaintiff must first establish a *prima facie* case of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  For an ADA claim, this case consists of four elements, requiring the plaintiff to show that (1) he is disabled within the meaning of the ADA; (2) he was meeting the legitimate expectations of his employer; (3) he suffered an adverse employment action; and (4) similarly situated, non-disabled employees received more favorable treatment.  *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (ADA).  If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged employment action.  *McDonnell Douglas*, 411 U.S. at 802.  Once the defendant has done so, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for discrimination.  *Id.*, 411 U.S. at 804.

Martin does not bother to specify which of these methods he relies on, nor is it evident from his response brief.  However, he has not proffered any direct or circumstantial evidence of discrimination that would support a claim under the direct method of proof, nor is any apparent from the record, so the Court will analyze his claims under the indirect method.

Martin fails on at least the second and fourth prongs of the *prima facie* case.  The second prong requires him to show that he was meeting the District's legitimate expectations, and he has not even attempted to do so.  As explained *supra*, he has not rebutted (or even so much as

questioned) the District's voluminous evidence of the flaws in his performance, and thus he essentially concedes a failure to meet the second prong of the *prima facie* case.  It hardly needs explaining that a teacher who is "unable to implement his lessons effectively," "lacks effective, meaningful communication with parents," and is "unprofessional and disrespectful toward his coworkers" was not meeting his employer's legitimate expectations.[8]

Martin also fails to establish the fourth prong of the test, that similarly situated, non-disabled employees received more favorable treatment than him.  Again, he does not even make an effort to satisfy this prong, as he does not offer any names of similarly situated employees.  While he does make an offhanded allegation that he was "over-evaluat[ed]" and thus "singled out in a manner that no other teacher in the [District] has ever been," this fact, even if true, is plainly insufficient to meet the fourth prong.  It is not enough to show that he was treated worse than other employees; he must show that he was treated worse than *similarly situated, non-disabled employees*.  Thus, if Martin could show that a non-disabled teacher failed as miserably at the job as he did, but was not terminated, he could meet this prong.  He makes no effort to do so.

Because Martin fails to create a genuine issue of material fact on at least two prongs of his *prima facie* case, his termination claim fails as a matter of law.  *E.g., Amadio*, 238 F.3d at 924.

## V. CONCLUSION

Martin's response brief, viewed as a whole, presents a dark vision of the District ignoring

---

[8]Martin's only arguments on this score are the same ones he has been flogging throughout the rest of his brief: that the District caused his poor performance by not directly contacting his doctors about possible accommodations, not informing Grate and Clay of his disabilities, and so forth.  Those arguments are rejected in other contexts *supra*, and they are no more persuasive here.

his pleas for accommodation, setting him up to fail at his job, and then discriminatorily terminating him when he did so.  However, as demonstrated *supra*, this narrative does not find support in the record.  Martin has given the Court no reason to believe that he could have performed his job competently, no matter what accommodations he received.  The District, contrary to Martin's claims, bent over backwards to accommodate his disabilities, and if it failed to do so in some instance, in was only because Martin ignored legitimate requests for information.  Finally, the District terminated Martin for good reason: despite his previous accommodations, he proved unable to meet even the most basic requirements of effective teaching.

For the reasons given above, Defendants' motion for summary judgment (Docket # 49) is GRANTED.  The Clerk is ORDERED to enter judgment in favor of the defendants and against the plaintiff.  Also, Defendants' motion to strike (Docket # 59) is DENIED.


Enter for this 3rd day of August, 2005.


/S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

25